## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

| | |
|---|---|
| **TEREL ARMSTRONG,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **Civil Action File No.:** |
| | ) **JURY TRIAL DEMANDED** |
| **THE SAINT JAMES** | ) |
| **SCHOOL,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiff **Terel Armstrong** brings this civil action for relief and damages against Defendant **The Saint James School** based on the following factual allegations and causes of action.

## NATURE OF THE ACTION

1.     This action to correct unlawful employment practices by the Saint James School ("Saint James"), arises under 42 U.S.C.A. § 1981 and the mixed motive provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(m).

2.      Plaintiff Terel Armstrong ("Armstrong" or "Plaintiff"), a black male, was employed as the Youth Development Director and Assistant Athletic Director at Saint James.

3.      As Assistant Athletic Director, Armstrong was expected by Saint James' leadership and financial boosters to covertly perform a role that the Alabama High School Athletic Association ("AHSAA") considers impermissible: the promise of scholarships and financial support to lure athletes to enroll at the school in order to improve its competitive prospects. As Saint James knows well, AHSAA has sanctioned private schools for this practice repeatedly.

4.       Armstrong's recruitment operation at its core involved luring black athletes, and over the course of his tenure at Saint James, some of the school's more prominent boosters pushed back that Armstrong's efforts were drawing "the wrong kinds of blacks" to campus. That backlash eventually led to Armstrong's termination as soon as the school's leadership was handed a convenient, and disingenuous, pretext.

5.      Armstrong's firing over a verbal dispute with a parent sharply contrasts with Saint James' leniency toward white athletic officials who have had vehement public classes with parents and school officials, or subjected the school to potential liability by pursuing inappropriate relationships with subordinates.

6.     To address   ongoing discriminatory conduct, Armstrong seeks economic damages of back pay and front pay; compensatory damages for emotional distress and mental anguish; as well as his attorneys' fees and costs of litigation.

## THE PARTIES

7.     Terel Armstrong at all times relevant to this complaint was employed by Saint James.

8.     Saint James is a private elementary and secondary school that is based in Montgomery, Alabama and is subject to liability under Title VII and § 1981.

## PERSONAL JURISDICTION

9.     Saint James is subject to service through its registered agent, Lawrence U. McLemore, at its principal place of business at 6010 Vaughn Road, Montgomery, Alabama 36116.

## SUBJECT-MATTER JURISDICTION AND VENUE

10.     Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

11.     Venue is proper in this district and division under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendant resides in and conducts business in this district and

division and the acts or omissions giving rise to the claim occurred in the same venue.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.    On April 16, 2025, Armstrong filed a charge of race discrimination against Saint James with the Equal Employment Opportunity Commission ("EEOC"). A copy is attached as Exhibit A.

13.    On August 18, 2025, Armstrong received a notice of right-to-sue. A copy is attached as Exhibit B. Armstrong timely files his Title VII discrimination claim.

## FACTUAL ALLEGATIONS

14.    Saint James is regarded as one of the most academically prestigious private schools in the central Alabama area. Its roster of alumni and its parental base includes a wide spectrum of civic and business leaders in the Montgomery community.

15.    The school's demographic makeup is roughly 60% white, and 20% Asian or East Indian. In a county whose public school population is nearly 80% black, Saint James' percentage of black students consistently hovers around 15%.

16.     Armstrong was hired by Saint James in June 2023 to perform dual roles as Assistant Athletic Director and Youth Sports Director.

17.     In his capacity as Youth Sports Director, Armstrong oversaw Saint James' participation in city-wide youth sports leagues for elementary and junior high school aged children. Armstrong's Assistant Athletic Director duties involved administrative roles related to the maintenance of Saint James athletic facilities and the supervision of student athletes.

18.     Despite the fact that AHSAA rules forbid the use of financial incentives to recruit student athletes to attend independent private schools, Armstrong was instructed to actively engage in prohibited recruitment practices.

19.     The bulk of Armstrong's recruitment efforts involved black female basketball players with whose families Armstrong had built connections through his activities as a part-time girls' basketball coach in regional extracurricular teams in Central Alabama.

20.     Much of Armstrong's sales pitch to parents involved pledges of scholarships from Saint James boosters and in some cases direct introductions between parents and potential funders.

21.     During 2024, Armstrong began to hear reports about negative feedback from some disgruntled white parents about the rising numbers of black

girls on Saint James' basketball teams and whether some of the young women were appropriate candidates for enrollment at Saint James.

22.    The school's Admissions Director Elizabeth Hawke and Assistant Admissions Director Laura Hassell expressed to Armstrong that the uptick in black female basketball players had drawn the ire of some white parents and that Armstrong's recruitment campaign was becoming a source of internal conflict–not because of its contravention of AHSAA policies but because of its injection of a type of lower income black students whom a cohort of white parents found objectionable.

23.    In the same time frame that Armstrong was becoming controversial in some quarters, Saint James athletic officials started to experience a broader backlash against rising levels of black athletic enrollment in other sports.

24.    In his capacity as Assistant Athletic Director, Armstrong participated in what were thinly veiled recruitment strategy sessions between Saint James' athletic leadership and Dr. Larry McLemore, the school's Headmaster since 2015. During these sessions, McLemore began to voice concerns that some targeted black athletes were not "a good fit" for Saint James.

25.    During the EEOC investigative process, Saint James' legal counsels appeared to acknowledge in their position statement that the phrase "good fit" was

bandied about in reference to potential black applicants but that the phrase was no more than a generic reference to whether a prospective student reflected the school's core values.

26.    But Saint James' Head Football Coach Aubrey Blackwell and Defensive Coordinator Jeff Corley, both white men, bristled in recruitment meetings about McLemore's persistent references to whether black athletes were a "fit" for Saint James' culture and openly questioned whether the phrase was racially coded.

27.    At several points, Blackwell and Corley expressed that Saint James was becoming increasingly skeptical of admissions for Black athletes.

28.    On January 7, 2025, Armstrong became involved in a verbal altercation on campus grounds with a parent of a child in the City's youth sports league who participated in practices at Saint James.

29.    The other parent acted as the aggressor and had to be physically restrained from striking Armstrong or his wife, who was present.

30.    Armstrong was suspended and fired by McLemore on January 9.

31.    Athletic Director Larry Ware, who is black, advised McLemore that video footage of the incident established that Armstrong was not at fault.

32.    Still, McLemore insisted on moving forward with firing Armstrong: Ware told Armstong that the real impetus for the firing was not the altercation, but the influence of several prominent Saint James boosters.

33.    Armstrong's firing over a parent-instigated argument contrasts with the decidedly more lenient approach Saint James has taken with white athletic officials who have violated school conduct policies.

34.    For example, Defensive Coordinator Corley was involved in a shouting match with a parent of a football player and another incident where he hurled a profanity at an athlete: Corley was not disciplined over either episode.

35.    A white Athletic Director prior to Ware had a loud verbal argument with the principal of the high school wing of the campus with no disciplinary consequences.

36.    Most egregious, when Saint James learned that another former Athletic Director, also white, had entered a sexual relationship with a female trainer on his staff, the school took no disciplinary action although its policies prohibit intimate relationships between staff and subordinates.

37.    When the affair ended, the same Athletic Director pressured the trainer to resume having sexual encounters, a clear liability risk for Saint James.

Yet, rather than terminate him, Saint James permitted him to resign in lieu of termination and to finish the school year.

38.    While several of the aforementioned episodes featured misconduct violations of a different nature than Armstrong's alleged infraction, each implicated Saint James' disciplinary policies and one ran afoul of the school's morality code for employees. The substantially more lax approach for Armstrong's peers reflects an inconsistent exercise of Saint James' disciplinary policies to the detriment of a black man.

## CAUSE OF ACTION

## COUNT I

### (Race discrimination in violation of 42 U.S.C.A. § 1981)

39.    Plaintiff Terel Armstrong incorporates by reference the preceding factual allegations of this complaint as though set forth fully and separately herein.

40.    Defendant Saint James made Plaintiff's race a determinative, but-for cause of his termination by ratifying racially inspired parental bias against Plaintiff that targeted him as a black athletic official too aggressively recruiting black athletes.

41.    Saint James also subjected Plaintiff to racially discriminatory treatment by selectively enforcing its disciplinary policies in a manner that treated

white athletic officials more leniently than Plaintiff who committed similar or more egregious offenses.

42.     As a result of the discriminatory conduct by Saint James, Plaintiff has suffered economic damages including back pay and front pay; as well as noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II

### (Race discrimination in violation of 42 U.S.C.A. § 2000e-2(m))

43.     Plaintiff Terel Amstrong incorporates by reference the preceding factual allegations of this complaint as though set forth fully and separately herein.

44.     Defendant Saint James' termination of Plaintiff reflects the impermissible consideration of race in an employment decision, even though other lawful factors may have also motivated the decision.

45.     As a result of the discriminatory conduct by Saint James, Plaintiff has suffered economic damages including back pay and front pay; as well as noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## **PRAYER FOR RELIEF**

Wherefore, based on the above-stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Lost wages, including front pay and back pay.

B. Compensatory damages to the extent allowed by law.

C. Punitive damages.

D. Attorneys' fees and costs of litigation.

E. Pre-judgment and post-judgment interest at the highest lawful rate.

F. Such other equitable and monetary relief as the court deems just and proper.

Respectfully submitted the 17th day of November, 2025.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis
ASB-3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

**Attorney for Plaintiff Terel Armstrong**